**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| MIRWAISS AMINZADA, | ) | |
| | ) | |
| Petitioner, | ) | Criminal No. 1:13-cr-130 |
| v. | ) | Civil No. 1:15-cv-825 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION**

THIS MATTER comes before the Court on Petitioner Mirwaiss Aminzada's ("Petitioner") Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255.

Petitioner owned and operated several companies dedicated to international sales, including Royal Canadian Imports, headquartered in Canada, and Essa Gulf Trading, headquartered in Dubai, United Arab Emirates. Between August 2009 and August 2012, Petitioner sold misbranded chemotherapy drugs and injectable cosmetic drugs to Gallant Pharma International, Inc. ("Gallant Pharma") and its co-owners, Talib Khan and Syed Huda. Petitioner and his companies were not licensed as prescription drug wholesalers anywhere in the United States.

The FDA-approved drugs acquired by Petitioner were subject to the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. Petitioner admits that the drugs he sold to Gallant Pharma for resale in the United States were prescription only and were

misbranded. Petitioner also sold FDA-approved versions of drugs to Gallant Pharma, for resale in the United States, but he was not authorized to import these FDA-approved drugs into the United States.

The owners of Gallant Pharma, Khan and Huda, would generally retrieve the misbranded drugs they purchased from Petitioner from a warehouse in Montreal, Canada. They then used false customs declarations to ship the misbranded drugs to the United States. On at least one occasion, Khan directed Petitioner to personally complete false customs forms and send misbranded drugs from Canada to the United States. On or about September 19, 2011, Khan sent an e-mail to Petitioner instructing him to mail the drugs:

> Bro ... you take the products to Canada Post and mail it with tracking. That's all. It's very simple. There is a 2 day (if sending cold chain products) —and a 4 day delivery. Only put 10 to 20 units per box so the value of the box does not exceed 1 Ok. For the description, simply write "Medical Devices." For the value of the merchandise, put $100.00.

The same day, Petitioner asked in response: "who do we write as a shipper as we don't have pharma license and telephone number." Khan responded to Petitioner: "Just put Royal Canadian Imports. In the last 2 years, not a single box has been seized by US Customs ... so don't worry. For phone number, just put your employee's cell phone number."

2

On or about January 12, 2011, Huda and Khan complained to Petitioner that they had received 200 boxes of Anzemet from Petitioner, and that only three of the boxes were clean. The remaining 197 boxes were smudged, or were labeled "Afghanistan only." In reply, Petitioner stated that a serious buyer would not be deterred by such labels or smudges.

On or about October 22, 2011, Petitioner sent an e-mail to Huda to inquire whether Huda had received Taxotere from Petitioner. Petitioner asked Huda whether Huda would be able to repair "the one that has a tape behind." Petitioner added, "I can probably try to fix it too ... please advise me." On or about October 24, 2011, Petitioner sent an e-mail to Huda and stated: "I have repaired the rest of the taxoteres 80mg ... should I ship it to you?" On or about October 25, 2011, Huda sent an e-mail to Petitioner and stated that Gallant Pharma's buyer in the United States said the Taxotere provided by Petitioner did not look right. Specifically, the drugs looked like they had been repackaged; the batch number and expiration dates looked different than what normally appeared on Taxotere boxes; and the packaging inserts did not look authentic. As such, Huda stated that Gallant Pharma's buyer had requested Petitioner provide a Certificate of Analysis for the Taxotere. In response, on or about October 26, 2011, Petitioner represented that he had purchased the Taxotere directly from Sanofi, the drug

3

manufacturer. Petitioner stated: "this taxotere had only inkjet writing that said export to that country which while erasing it my guy there messed up."

In or around August 2012, Huda and Khan informed Petitioner that they identified Petitioner as the source of tampered Botox that entered Gallant Pharma's supply chain. Among other things, Huda claimed that the shipment contained Botox vials that were broken, contained an improperly-colored liquid, and/or were missing protective caps. Some packages containing the Botox vials were discolored, and some lot numbers and expiration dates were mismatched between the vials and the packages. In and e-mail exchange with Petitioner, Huda characterized the introduction of tampered Botox as "criminal," and noted that he did "not use that term lightly." Huda directed the Gallant Pharma office manager to leave all Botox vials from that shipment on Huda's desk, at room temperature. More than a week later, Huda personally examined the Botox vials, and subsequently returned the vials to Petitioner. Petitioner directed Huda to include ice packs with the return shipment. Huda did so, and did not disclose to Petitioner that the Botox vials had been left at room temperature for more than a week. Following this incident, Gallant Pharma did not purchase any more drugs from Petitioner.

As a result of Petitioner's actions, he was indicted along with several co-conspirators on March 27, 2013, and charged with

4

one count of conspiracy in violation of 18 U.S.C. § 371 and one count of importation contrary to law in violation of 18 U.S.C. § 545 and 2. On December 19, 2013, Petitioner entered a guilty plea to a criminal information charging one count of introducing misbranded drugs into interstate commerce, in violation of 21 U.S.C. § 331(a). A judgment of conviction was entered on June 10, 2014, whereby Petitioner was sentenced to fifteen (15) months imprisonment, one year of supervised release, a special assessment fine of $100.00, and ordered to pay restitution in the amount of $586,798.00. On June 25, 2015, the Petitioner filed the instant Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255.

A petitioner attacking his conviction or sentence pursuant to 28 U.S.C. § 2255 bears the burden of proving that at least one of four grounds justify relief: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States;" (2) "that the court was without jurisdiction to impose such sentence;" (3) "that the sentence was in excess of the maximum authorized by law;" or (4) that the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a) (2008). The catch-all fourth category of non-jurisdictional, non-constitutional errors are cognizable under § 2255 only where the alleged error presents either "a fundamental defect which inherently results in a complete miscarriage of justice," "an

5

omission inconsistent with the rudimentary demands of fair procedure," or other "exceptional circumstances" that make the need for remedy apparent. See Hill v. United States, 368 U.S. 424, 428 (1962).

A motion pursuant to § 2255 "may not do service for an appeal." United States v. Frady, 456 U.S. 152, 165 (1982) (internal citation omitted); see also Dragonice v. Ridge, 389 F.3d 92, 98 (4th Cir. 2004) (citing Frady, 456 U.S. at 164-65). Errors that should have been raised at trial or on direct appeal, but were not, are procedurally defaulted. Frady, 456 U.S. at 167-68.

There are three exceptions to the well-established procedural default rule. First, procedural default will not act as a bar to collateral relief where a petitioner demonstrates cause for the procedural default and actual prejudice therefrom. Id. at 167. Such an error must work to the "actual and substantial disadvantage" of the petitioner—not merely create a possibility of prejudice. Murray v. Carrier, 477 U.S. 478, 494 (1986) (quoting Frady, 456 U.S. at 170). Second, procedural default will not act as a bar where a petitioner can demonstrate actual innocence in either a capital case or a case in which a recidivist sentencing enhancement was applied. United States v. Mikalajunas, 186 F.3d 490, 494-95 (4th Cir. 1999). Third, procedural default will not act as a bar where a petitioner

brings a claim of constitutionally ineffective assistance of counsel. United States v. DeFusco, 949 F.2d 114, 120-21 (4th Cir. 1991).

In Strickland v. Washington, the U.S. Supreme Court held that the Sixth Amendment right to counsel includes the right to the effective assistance of counsel. 466 U.S. 668, 686 (1984). To establish a claim for ineffective assistance of counsel, a defendant must prove both that his counsel's conduct fell below an objective standard of reasonableness and that the deficient performance caused the defendant actual prejudice. Id. at 687-88, 691-92. "The defendant bears the burden of proof as to both prongs of the [Strickland] standard." United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010).

Under Strickland, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" 466 U.S. at 689. The Strickland standard is highly deferential to counsel. Id. at 686, 689, 690. The evaluation of a defense counsel's performance is made from his or her perspective at the time of the alleged error and in the light of all circumstances. Id. at 690.

To satisfy the second prong of the Strickland test, "[t]he defendant must show that there is a reasonable probability that,

7

but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In other words, a defendant must affirmatively prove prejudice that is so serious as to have deprived him of a fair trial, a trial whose result is unreliable. Id. at 693.

"Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Id. at 700. Because "[t]he defendant bears the burden of proving Strickland prejudice," if a defendant fails to meet this burden, "a reviewing court need not consider the performance prong." Fields v. Attorney General of Maryland, 956 F.2d 1290, 1297 (4th Cir. 1992) (citing Strickland, 466 U.S. at 697).

As a pro se litigant, Petitioner is entitled to a liberal construction of his § 2255 Motion. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972). Petitioner asserts that his defense counsel provided ineffective assistance of counsel during plea negotiations, at sentencing, and on appeal. Specifically, he asserts the following: 1) counsel failed to identify or notify him of viable defenses to the crimes he was accused of prior to entry of a plea; 2) counsel failed to provide his changes to the statement of facts to the Government; 3) counsel failed to ensure that the Government's oral promises during plea negotiations

8

relating to the amount of restitution were incorporated into the plea agreement, and failed to object to the restitution order; 4) counsel failed to object to the Pre-Sentence Report calculation of loss amount or request specific performance of the Government's oral promises concerning loss amounts; and 5) counsel erroneously advised there were no meritorious issues on appeal.

Petitioner argues that his counsel failed to inform him of viable defenses to the crimes with which he was charged by indictment. Had he proceeded to trial, he was charged with one count of conspiracy in violation of 18 U.S.C. § 371 and one count of importation contrary to law in violation of 18 U.S.C. § 545 and 2. Petitioner now asserts that he was not properly informed as to the potential defenses to these charges, and generally asserts that he could have argued a good faith defense. Specifically, he alleges that his counsel should have informed him that,

> ...his lawful sales outside the US to his codefendants did not prove that he agreed with the codefendants to violate US law on misbranding and importation of drugs, even though Petitioner later became aware that some of the drugs he sold to Gallant Pharma were later sold to US physicians in violation of US law, and that none of the Governments [sic] evidence proved the mens rea element of conspiracy under 18 USC 371...

He further alleges that his counsel should have advised him that,

9

...he did not aid and abet the importation of misbranded drugs in violation of 18 USC 545 by his codefendants who shipped drugs from Canada and England to the US, because he was not aware they were going to import the drugs in advance and Petitioner did not take any affirmative act in furtherance of the importation with intent of facilitating the offenses commission.

For each of these allegations, the evidence in the record is sufficient on its own to demonstrate that Petitioner's alleged good faith defense would have failed at trial. As Petitioner himself seems to admit by stating that he "later became aware that some of the drugs he sold to Gallant Pharma were later sold to US physicians in violation of US law," the evidence in the record from Petitioner's agreed Statement of Facts indicated that as early as September 2011, Petitioner was on notice that the drugs he was providing to Gallant Pharma were being shipped to the US. The September 19, 2011, email, in which he discusses whether he will send drugs directly to the U.S. and how to do so, as well as the October 25, 2011, email exchange in which he responds to a U.S. buyer's complaints about indicia of inauthenticity of the Taxotere he had shipped, are enough by themselves to demonstrate that he was well aware that his drugs were being sold in the U.S. Further, Petitioner took steps such as removing labeling with rubbing alcohol to conceal the countries where the drugs were intended for use, such as Dubai and Afghanistan. As early as January 2011, in response to complaints about the smudges or "Afghanistan only" labels on

10

boxes of Anzemet that Petitioner had sold to Gallant Pharma, Petitioner stated that a serious buyer would not be deterred by labels or smudges. These are not the words of a man acting in good faith.

On September 16, 2013, Petitioner and his counsel participated in a reverse proffer in which the emails discussed above, as well as other evidence against Petitioner, was discussed. Defense counsel David Benowitz confirms as much in his declaration ("Declaration"). Petitioner's counsel acted reasonably by advising him that the emails would demonstrate his intent, and would substantially undermine any defense that relied on his lack of intent.

Notwithstanding his agreement to the contrary in his Statement of Facts, Petitioner also argues that he had potential defenses to the misbranding charge, 21 U.S.C. § 331(a), to which he pleaded guilty. Petitioner's arguments as to potential defenses to the crime he chose to plead guilty to, 21 U.S.C. § 331(a), are wholly irrelevant. Had Petitioner proceeded to trial, the offense to which he pleaded guilty was not an offense for which he would have been tried.

In connection with his assertion that his counsel was ineffective for failing to incorporate the Government's "oral promises" into the plea agreement, discussed in more detail below, Petitioner argues that he was not properly informed of

11

the potential sentencing outcomes for his guilty plea, and understood that at most he would be subject to 1-6 months of imprisonment. Petitioner further argues that he was prejudiced by this purported failure to inform him of the potential sentencing outcomes because he would have gone to trial had he known.

Petitioner was charged with one count of conspiracy in violation of 18 U.S.C. § 371 and one count of importation contrary to law in violation of 18 U.S.C. § 545 and 18 U.S.C. § 2. 18 U.S.C. § 545 and 18 U.S.C. § 2 violations are punishable by up to twenty years imprisonment, up to three years supervised release, a fine of up to $250,000, and a $100 special assessment. 18 U.S.C. § 371 is punishable by a term of imprisonment of up to five years, up to three years supervised release, a fine of up to $250,000, and a $100 special assessment. Combined, the two counts of the indictment exposed Petitioner to up to 25 years in prison. Petitioner pleaded guilty to one count of introducing misbranded drugs into interstate commerce, in violation of 21 U.S.C. § 331(a). This offense carries a maximum term of imprisonment of three years (36 months), up to one year supervised release, a fine of up to $10,000, and a $100 special assessment.

Petitioner's counsel affirms that he did discuss potential sentencing outcomes with the Petitioner. Further, given the

12

statutory maximum of 36 months, there would have been little cause to discuss the specifics of the 37 to 46 month guidelines range that could have been (and eventually was) applicable in the event that certain enhancements and the $586,798 loss amount were applied. As Petitioner's counsel correctly points out, reduction in his sentencing exposure from 25 years to 3 years was a significant and favorable outcome for Petitioner. That a plea bargain is "favorable" to a defendant and that accepting it was "a reasonable and prudent decision" is evidence of the "voluntary and intelligent" nature of the plea.

Further, the Court confirmed during the plea colloquy that Petitioner understood he was subject to the maximum penalties, and that confirmation cures whatever deficits in understanding Petitioner might have had. The Court asked, "You understand if your plea is accepted, you could be imprisoned up to 3 years, pay a fine of up to $10,000, serve up to 1 year of supervised release, in addition to paying a special assessment fine of $100?" Petitioner responded, "Yes, Your Honor." The Court further asked, "And do you understand that by pleading guilty, the Court may impose the same punishment as if you had been tried and convicted by a court or by a jury?" to which Petitioner replied "Yes, Your Honor." Petitioner suffered no

prejudice, even if the Court credits his assertion that he was not properly instructed as to the potential guidelines range.

In addition to the assertions above, Petitioner makes a series of accusations as to the ineffective assistance of his counsel during plea negotiations. Specifically, he alleges: (1) he maintained his innocence but was pressured to plead guilty; (2) he only had one day to accept the plea agreement; and (3) he had signed a different version of the statement of facts than the one that was filed, because his counsel never shared his version with the Government.

In making such accusations, a Petitioner must demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Hooper v. Garraghty, 845 F.2d 471, 475 (4th Cir. 1988). Statements made by a Petitioner in a Rule 11 proceeding is binding absent "clear and convincing evidence to the contrary." Fields, 956 F.2d at 1299 (citing Blackledge v. Allison, 431 U.S. 63, 74-75 (1977)). That a plea bargain is "favorable" to a defendant and that accepting it was "a reasonable and prudent decision" is evidence of the "voluntary and intelligent" nature of the plea. Id. Each of these allegations is examined more thoroughly below, and Petitioner is unable to demonstrate any prejudice as to any of these allegations.

Petitioner now asserts that he was pressured to plead guilty by his counsel, but that he maintained his innocence throughout the proceedings. Petitioner's counsel affirms that Petitioner did not maintain his innocence, but rather repeatedly asked why he was being singled out for what he considered to be common conduct. Further, Petitioner indicated that he understood he was being charged with introducing misbranded drugs into interstate commerce, that he agreed with the statement of facts, and that he did not make any claim that he was innocent of the charge contained in the criminal information. Specifically, in his plea colloquy, he declared under penalty of perjury the following:

> THE COURT:   And do you understand that this information charges you with introducing misbranded drugs into interstate commerce?
> THE DEFENDANT: Yes, I do.
> THE COURT: And you understand in order to convict you of this offense, the government would have to prove beyond a reasonable doubt that you did in fact introduce misbranded drugs into interstate commerce, and that you did so knowingly, willfully, and intentionally?
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: Do you disagree in any particular with the statement of facts?
> THE DEFENDANT: No, Your Honor.
> THE COURT: Is what this statement says happened in fact what did happen?
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: Do you make any claim that you are innocent of the charge contained in this information?
> THE DEFENDANT: No, Your Honor.

Petitioner did not indicate during the plea hearing that he

maintained his innocence or that he did not believe he had committed the crime of which he was pleading guilty. Further, Petitioner now seems to be arguing that he is not guilty as a matter of law, because he had defenses available. Notwithstanding that those defenses lack merit, assuming arguendo there were viable defenses to the charge in the information, he chose to plead guilty to the charged offense, rather than face trial on the indicted charges that carried much higher penalties. His "buyer's remorse" now does not change the decision he made with the assistance of reasonable and competent counsel. The defendant cannot simply withdraw his guilty plea on a "lark" after the Court properly accepts a guilty plea. United States v. Hyde, 520 U.S. 670, 676 (1997); United States v. DeFreitas, 865 F.2d 80, 83 (4th Cir. 1989) (no fair and just reason exists when a defendant has simply changed his mind about the relative benefits of going to trial versus pleading guilty).

Further, Petitioner's comments at sentencing are inconsistent with his assertion now that he consistently "maintained his innocence." At sentencing, Petitioner stated:

> I stand before you as a person who made a mistake. I also stand before you as a person who has learned a costly hard lesson. I'm truly remorseful for the action that I took ... While I cannot go back and reverse what I did, you can rest assure that this will never happen again. I blame myself for making the wrong choices, Your Honor. I plan to own up my action [sic] and make amends for my mistakes.

16

If Petitioner was maintaining his innocence, surely he would not have apologized for his actions or shown remorse for his crime in this manner.

Petitioner now alleges that he had insufficient time, only one day, to accept the plea agreement. This is belied by his statement at his Rule 11 hearing:

> THE COURT: Do you feel you've had a sufficient length of time to confer with your attorney in order to fully understand the case?
> THE DEFENDANT: Yes, your Honor.

Further, Petitioner's counsel affirms that they discussed the plea offer extensively on multiple occasions, and that at least one meeting was face to face, with the plea agreement in front of them. The favorable terms of his plea weigh in favor of the lack of prejudice Petitioner would have suffered, even if this Court credits his assertion that he had only one day to consider the plea agreement.

Petitioner makes the extraordinary accusation that his counsel allowed him to make edits to the Statement of Facts, had him sign that Statement of Facts with the understanding that his edits would be accepted by the Government, and then did not in fact present those edits to the Government, such that the Statement of Facts included with the plea agreement in the record is not the Statement of Facts signed by Petitioner. This accusation is vehemently denied by Mr. Benowitz, and the evidence

17

in the record supports Mr. Benowitz's position that Petitioner did in fact sign the version of the Statement of Facts that was filed with the Court.

The Statement of Facts that was filed with the Court on December 19, 2013, includes a handwritten revision on pages 1 and 2 bearing the initials of both Mr. Benowitz and Petitioner. Notably, this revision is to a sentence that Petitioner alleges now that he crossed out completely in his 'version' of the Statement of Facts – it is the sentence indicating that Petitioner "was aware that many of the drugs he sold to Gallant Pharma would be resold in the United States." Petitioner alleges that he signed each page of 'his' version of the Statement of Facts, yet the copy he provides with his motion has no such markings. Petitioner asks this Court to believe that his counsel deceived him into thinking that a revised Statement of Facts, no copy of which Petitioner can provide, was filed with the Court, when, Petitioner alleges, the original, unchanged version was secretly filed without his knowledge and his signature page was appended. As Petitioner's counsel affirms, when they were negotiating the Statement of Facts, Petitioner and his counsel were on the phone together with Assistant U.S. Attorney Kelly, and together they discussed which changes she would accept.

Further, the version of the Statement of Facts that Petitioner submitted to the Court as Attachment 3 to his Motion

does not include a signature page, which belies his allegation
that it is a copy of the version of the Statement of Facts that
he signed. As counsel affirms, between the plea hearing and
sentencing, Petitioner was provided with a signed copy of the
Statement of Facts as filed, and did not at that time raise any
concerns that it was not the version he thought he signed.
Counsel met with Petitioner after the plea agreement was entered
in open court to discuss sentencing, and Petitioner did not raise
any concerns with the version of the Statement of Facts he now
disavows.

Petitioner attempts to challenge his agreed upon restitution
order as unconstitutional as a result of ineffective assistance
of counsel. Restitution orders are generally not cognizable on
collateral review. "Quite simply, a restitution order, absent
substantial justification, is not the proper subject of a § 2255
petition and may not be collaterally attacked." United States v.
Landrum, 870 F. Supp. 699, 702 (E.D. Va. 1994) *aff'd*, 93 F.3d 122
(4th Cir. 1996). Ineffective assistance of counsel allegations
related to restitution are not cognizable in a § 2255 proceeding
because restitution orders do not meet the provisions "in
custody" requirement. See e.g., Kaminski v. United States, 339
F.3d 84, 87-88 (2d Cir. 2003) ("Nearly every circuit to consider
the issue has concluded that an order of restitution may not be
attacked in a § 2255 petition, even if the petition also alleges

19

error in the sentence of imprisonment."). Petitioner's assertions that his counsel provided ineffective counsel with respect to restitution are simply not cognizable under § 2255.

Even if the Court were able to consider Petitioner's assertions as to the restitution order, his allegations lack merit. Petitioner argues first that his counsel provided ineffective assistance by failing to properly advise him as to how restitution would be calculated and by failing to "mov[e] the court at sentencing to order specific performance of the Government's oral promises" as to how restitution would be calculated. Petitioner alleges that his counsel informed him that calculation of restitution using "income" as referred to in the plea agreement meant gross profit, not payment receipts, and "the US attorney had promised that [drugs with proper National Control Numbers] were not misbranded and would be excluded from the loss for purposes of restitution." Petitioner further alleges that his counsel told him "the Government promised not to include drugs that never entered the US in the restitution loss." Further, the Petitioner alleges that his counsel informed him that the amount he was paid as a result of an old debt would not be included in restitution, because the agreement specified restitution as due on profits realized from August 2009 to 2013. Petitioner alleges that he went over the various payments he received from Gallant Pharma with his counsel and that the gross

profit he realized was $15,486. He alleges that his counsel

agreed that "pursuant to the promises made by the Government as

to calculation of restitution that about $15-16 thousand in

Restitution would be imposed."

Petitioner's counsel is quite clear that he did not indicate

to his client that the Government had "promised" anything with

respect to restitution or any other aspect of Petitioner's case,

outside of what was agreed to in the plea agreement. At his plea

colloquy, Petitioner confirmed that the plea agreement

represented the entirety of his understanding with the

Government:

> THE COURT:   Have you reviewed the plea agreement
> which has been signed by you and your counsel on the
> one hand and the government on the other?
> THE DEFENDANT:  Yes, Your Honor.
> THE COURT:   Does it contain the entire understanding
> you've reached with the government in this matter?
> THE DEFENDANT:  Yes, Your Honor.

In evaluating claims under § 2255, statements made by a defendant

under oath at a plea hearing carry a "strong presumption of

verity" and present a "formidable barrier" to subsequent

collateral attacks. Blackledge v. Allison, 431 U.S. 63, 73-74

(1977). "As the Fourth Circuit has made clear, 'courts must be

able to rely on the defendant's statements made under oath

during a properly conducted Rule 11 plea colloquy,' and § 2255

claims that contradict a petitioner's plea colloquy are deemed

'patently frivolous or false,' except in extraordinary

circumstances." Carpenter v. United States, 2015 WL 5254185, at
*4 (W.D.N.C. Sept. 9, 2015) (*slip copy*), citing United States v.
Lemaster*, 403 F.3d 216, 221-22 (4th Cir.2005). No such
extraordinary circumstances exist here.

Further, the plea agreement that Petitioner signed on
December 11, 2013, provides as follows: "Defendant agrees that
restitution is mandatory pursuant to 18 U.S.C. § 3663A.
Defendant agrees to the entry of an Agreed Restitution Order in
the amount of income received by the defendant on sales made to
Gallant Pharma International, Inc. ('Gallant Pharma'), Syed
'Farhan' Huda, and/or Talib Khan, between August 2009 and August
2013." The plea agreement signed by Petitioner further provides:
"This written agreement constitutes the complete plea agreement
between the United States, the defendant, and the defendant's
counsel. The defendant and the defendant's attorney acknowledge
that no threats, promises, or representations have been made, nor
agreements reached, other than those set forth in writing in
this plea agreement, to cause the defendant to plead guilty."

As Benowitz affirms, the Government did not represent to
counsel or to Petitioner that "the amount of income received by
the defendant on sales made" meant anything other than exactly
that. While it may have been the case that the Government
indicated it would consider offsetting or otherwise modifying
the amount in future negotiations, there were no promises made

and this was made clear to Petitioner by his counsel. Petitioner represented to this Court that he understood the plea agreement represented his entire understanding with the Government. He cannot now seek to attack his counsel's competency for failing to include as terms those items that he himself avowed were not included in the agreement.

The parties stipulated in the plea agreement that they would address loss amount, pursuant to U.S.S.G. §§ 2N2.1(c)(1) and 2B1.1(b)(1), at sentencing. Petitioner now alleges that he was prejudiced by his counsel's failure to "have the oral promises of the Government" incorporated into the plea agreement. Petitioner alleges that his counsel informed him that if the loss amount guideline were applicable, the Government promised to subtract the same amounts from loss as from restitution. As discussed above, Petitioner's "oral promises" argument is again wholly without merit.

Petitioner further argues that his counsel was ineffective for failing to raise objections to the loss amount used to calculate the appropriate range under the Sentencing Guidelines. His claim is defective in that, "[b]arring extraordinary circumstances . . . an error in the application of the Sentencing Guidelines cannot be raised in a § 2255 proceeding." United States v. Pregent, 190 F.3d 279, 283-84 (4th Cir. 1999). "Indeed, in order to warrant collateral relief pursuant to §

2255 based on an alleged sentencing error, a petitioner serving a federal sentence must establish that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." Milan v. United States, 57 F. Supp. 3d 571, 578 (E.D. Va. 2014). The Petitioner faced maximum penalties of three years imprisonment, 1 year of supervised release, a $100,000 fine, and a $100 special assessment. The petitioner's sentence of fifteen months was well below the maximum authorized by law, and he does not argue otherwise.

Petitioner has suffered no prejudice from the ineffective assistance of counsel he alleges. Petitioner's sentence of fifteen months was well below the guidelines range of 37 to 46 months. Had the Court accepted the Petitioner's offset argument at sentencing and lowered the applicable loss amount to $308,915, his fifteen month sentence would still be well below the guidelines range of 30-37 months.

Further, there is no merit to Petitioner's argument that his counsel was ineffective. The loss amount that Petitioner is referencing is that contemplated by U.S.S.G. § 2B1.1(b)(1). Application Note 3 of that section applies to the determination of loss under subsection (b)(1). Application Note 3(F)(v) sets

forth that in misrepresentation schemes such as Petitioner's, "loss shall include the amount paid for the property, service or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services." U.S.S.G. § 2B1.1 n. 3(F)(v). The amount paid is the amount of income Petitioner received from Gallant Pharma in exchange for the misbranded drugs, $586,798.

At sentencing, as contemplated by the plea agreement, the parties argued for their own interpretations as to loss amount. Petitioner's counsel argued in his Memorandum in Aid of Sentencing that a downward variance would be appropriate in Petitioner's case because the guideline as applied to Petitioner's case would be unreasonably harsh. Petitioner's counsel again raised the issue at the sentencing hearing, advocating for his client as follows:

> "[T]he fraud guideline per 2B1.1 of the guidelines produces an overly harsh offense level in this case, particularly related to the loss amount It only looks at what Mr. Aminzada grossed, which is approximately $586,000, the dollars that— the money that he received from Gallant for the misbranded drugs. It doesn't take into account that almost half of the drugs that Mr. Aminzada sold had in fact the proper NDC number and the proper packaging. That—which is approximately almost 50 percent of the $586,000 that is termed by the guidelines to be the loss amount. The guidelines don't take into account that Mr. Aminzada voluntarily ceased these types of transactions about seven months before he was notified of the investigation against him, and that he in fact lost about $800,000 in these transactions with Gallant."

Contrary to Petitioner's assertions, his counsel zealously advocated for a downward variance on the basis that the fraud guidelines did not properly account for his client's unique situation.

Petitioner asserts that his counsel failed to provide effective assistance as to his rights on appeal by failing to advise him that breach of promise and unauthorized restitution orders were appealable. With regard to these claims, Petitioner asserts, "[i]f counsel had told me these claims were not barred, I would have instructed him to file an appeal and raise them." In so stating, Petitioner admits that he did not instruct his counsel to file an appeal.

> "[A] lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable. This is so because a defendant who instructs counsel to initiate an appeal reasonably relies upon counsel to file the necessary notice. Counsel's failure to do so cannot be considered a strategic decision; filing a notice of appeal is a purely ministerial task, and the failure to file reflects inattention to the defendant's wishes."
> Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000).

Petitioner's counsel affirms that they discussed appeal, and that counsel advised Petitioner that the appeal he sought to make would potentially breach his plea agreement. Petitioner agreed in his plea agreement that he "knowingly waives the right to appeal the conviction and any sentence within the statutory

maximum described above (or the manner in which that sentence was determined)," and that "restitution is mandatory pursuant to 18 U.S.C. § 3663A." Counsel requested that Petitioner sign a waiver form indicating that he understood the appeal he was considering would likely violate the plea agreement, and Petitioner refused. Petitioner did not instruct his counsel to file an appeal, and counsel acted reasonably in not doing so.

The burden of proof lies with Petitioner as to both prongs of the Strickland standard. United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Turning first to the prejudice prong, Petitioner has failed to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. He has not borne his burden of affirmatively proving prejudice so serious as to have deprived him of a fair trial. Id. at 693. Petitioner has failed to show actual prejudice with respect to Benowitz's performance.

Nor has Petitioner shown that Benowitz's performance was deficient in any way. There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689-90. Petitioner has failed to explain how any of Benowitz's actions fell below the professional norm. In sum, Petitioner has failed to overcome the "strong presumption that counsel's conduct

[fell] within the wide range of reasonable professional assistance." Id. at 689. Even if Petitioner could demonstrate some deficiency in Benowitz's performance, he has not established that it prejudiced him in any way. Accordingly, each of Petitioner's claims of ineffective assistance against Benowitz must fail.

Further, Petitioner is not entitled to an evidentiary hearing. An evidentiary hearing is necessary when it is unclear "from the pleadings and the files and records that the prisoner is entitled to no relief..." Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970). "In order to obtain an evidentiary hearing . . . a habeas petitioner must come forward with some evidence that the claim might have merit." Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992) overruled on other grounds by Gray v. Netherland 518 U.S. 152, 165-66 (1996).

For the reasons discussed above, this Court finds Petitioner's claims are without merit entitle him to neither § 2255 relief or an evidentiary hearing. Therefore, Petitioner's motion should be denied.

An appropriate order shall issue.

_Claude M. Hilton_
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
April 25, 2016

28